**CAVITRON CORPORATION, Plaintiff,**

v.

**ULTRASONIC RESEARCH CORPORA-
TION, Defendants.**

No. 66–856–Civ.

United States District Court
S. D. Florida,
Miami Division.
March 18, 1969.

Brumbaugh, Graves, Donohue & Raymond, New York City, Feibelman, Friedman, Hyman & Britton, Fort Lauderdale, Fla., for plaintiff.

Klein, Tannenbaum & McGovern, John Cyril Malloy, Miami, Fla., Carl V. Wisner, Jr., Fort Lauderdale, Fla., for de-

fendants, Sonic Industries Corp., John C. Adams, Adrienne J. Adams, Zoltan Haydu, Dorothy Haydu, John Eubanks and Marcel Marovitch.

FINDINGS OF FACT and CONCLUSIONS OF LAW

EATON, District Judge.

This patent infringement action came on for non-jury trial before the Court. The Court heard testimony, received evidence, heard argument by counsel and considered the proposed findings and conclusions presented by counsel. Therefore, the Court makes the following findings of fact and conclusions of law.

I. NATURE OF ACTION, JURISDICTION, PARTIES

1. This is an action under the Patent Laws of the United States for infringement of the following three patents:

(a) Patent No. 3,075,288 (hereinafter called the '288 patent), issued January 29, 1963, to Lewis Balamuth and Arthur Kuris, on an application filed December 24, 1954. Plaintiff relies on claims 8 and 9;

(b) Patent No. 3,076,904 (hereinafter called the '904 patent), issued February 5, 1963, to Claus Kleesattel, Lewis Balamuth and Arthur Kuris on an application filed August 29, 1958. Plaintiff relies on claims 15, 23 and 25;

(c) Patent No. 3,213,537 (hereinafter called the '537 patent), issued October 26, 1965, to Lewis Balamuth, Claus Kleesattel and Arthur Kuris, on an application filed on September 11, 1961, as a division of the original application filed December 24, 1954, that matured into the '288 patent. Plaintiff relies on claims 6 and 8.

2. Defendant Sonic Industries Corporation has counterclaimed charging false marking by Plaintiff under 35 U.S.C. § 292.

3. Plaintiff is the owner, by assignment, of all the right, title and interest in and to the patents in suit and has the right to sue for infringement thereof. The defendants fall into two categories: (a) Ultrasonic Research Corporation,

Louis Winter, Mrs. Louis Winter, William Czeisler and Rose Czeisler, parties to the original complaint; and (b) Sonic Industries Corporation (hereinafter called Sonic), John C. Adams, Adrienne J. Adams, Zoltan Haydu, Dorothy Haydu, John Eubanks and Marcel Marovitch, added as parties by the amended complaint. The defendants in the first category did not appear and defend at the trial, nor did they join in the execution of the pretrial stipulation. The parties in the second category did appear by counsel and participate in the trial of the cause. Counsel for plaintiff stated at the trial that he did not propose to ask for a judgment against those defendants who were not represented at the trial.

## II. THE PATENTS IN SUIT

4. The patents in suit relate to a new kind of dental instrument which utilizes ultrasonic energy for the drilling or cleaning of teeth. Plaintiff's units incorporating this initial design were placed on general sale to the dental profession in 1955. In this initial form, the instrument was designed for drilling of teeth. Approximately 1200 of such ultrasonic drilling units were sold by plaintiff in the years 1955 to 1957. In 1957, an improved version of plaintiff's ultrasonic dental instrument, specifically designed for prophylaxis use (cleaning of teeth) was placed on the market. This instrument, with but relatively minor changes has been sold to the dental profession continuously since 1957 and until late 1965 was the only ultrasonic dental prophylaxis instrument commercially available to the dental profession. It has achieved wide commercial and professional acceptance, and during the last ten years, more than 40,000 of such instruments have been supplied by plaintiff for use in prophylaxis and peridontal therapy. The present model of the plaintiff's instrument is known as the "Dentsply-Cavitron Model 660".

5. Generally, the ultrasonic dental instrument of the three patents in suit comprises a handpiece which is held by the dentist and a water and electrical supply system which is housed in a separate cabinet and coupled to the handpiece by a flexible conduit. The handpiece is controlled by a foot switch.

6. The handpiece has an outer casing or barrel within which there is an electrical coil, a sealed chamber for water circulation and cooling, and a vibratory system resiliently mounted within the barrel and connected with the tool extending from one end of the barrel.

7. The vibratory system of the handpiece is made up of an elongated magnetostrictive transducer or stack of laminated strips of nickel, an acoustical impedance transformer and a working tool, rigidly joined together. When subjected to the varying magnetic field produced by the coil in the handpiece, the magnetostrictive transducer elongates and contracts at a rate corresponding to the rate of variations of the magnetic field and thereby produces longitudinal vibrating motion at its ends. Such mechanical vibrations are amplified in the acoustical impedance transformer and transmitted to the working tool to set its operative tip in vibratory motion.

8. The supply and control system includes an oscillation generator for converting 60 cycle line current into a high frequency alternating or varying current of about 25,000 to 30,000 cycles per second, and a solenoid valve for controlling the supply of water from a tap. Electrical conductors from the oscillation generator and a supply tube from the water valve in the housing are enclosed within a common flexible conduit running from the housing to the end of the handpiece opposite the working tool.

### A. The '288 patent.

9. The '288 patent discloses the earlier form of plaintiff's commercial instrument, known as the Model 210, which was specifically designed for cutting or drilling teeth. In this device, the magnetrostrictive transducer and the acoustical impedance transformer are permanently retained within the handpiece barrel and the working tips or tools are attached to the stem of the trans-

former by screw threads. A resilient ring surrounding the transformer supports the vibratory structure within the barrel.

10. The sealing rings at the transformer end of the casing and a closure at the other end of the casing define a watertight chamber within the casing which encompasses the magnetostrictive transducer and a part of the acoustical impedance transformer. The energizing electrical coil is wound around the magnetostrictive transducer.

11. A current supply line extends through the closure at the end of the chamber opposite the working tool and is connected to the coil. A fluid supply line is coupled through the end of the closure to supply a fluid, such as water, to the casing chamber for the dual purpose of cooling the magnetostrictive transducer and coil during application of electrical power to keep their temperature within safe limits and supplying preheated or tempered fluid to the operative end of the work tool for application to the work area.

12. The use of the coolant for the magnetostrictive transducer as the treatment fluid for the operative procedure on the dental patient, as disclosed in the '288 patent, simplifies the instrument by providing the pre-warmed fluid necessary for performance of operative dental procedure to be supplied to the working tip without the addition of separate heating elements, conduits, etc., and at the same time disposing of the coolant for the magnetostrictive transducer.

13. Claims 8 and 9 of the '288 patent include in combination a length of magnetostrictive material, an energizing coil in the casing chamber, a sealed casing chamber for cooling, an operative tool projecting beyond one edge of the casing, a resiliently mounted vibratory assembly and a fluid supply line to the working tip.

B. *The '904 patent.*

14. The '904 patent discloses the later commercial versions of plaintiff's ultrasonic dental instrument handpiece known as the Model 30 and the Model 660. The handpiece of the '904 patent includes a tubular barrel of a size readily held in the hand and a vibratory insert composed of an elongated magnetostrictive transducer, an acoustical impedance transformer having a head section of relatively large mass and a stem section of relatively small mass, and a working tool, the three elements being rigidly joined together end-to-end in the order named. The casing or barrel surrounds a cylindrical coil which in turn surrounds an interior chamber formed within the barrel.

15. The vibratory insert is resiliently held in its working position, with the magnetostrictive transducer extending within the coil, by means of a tubular retainer which surrounds the stem of the transformer and has a neck section extending into the casing. A sealing ring snugly engages the interior bore of the retainer and the stem of the acoustical impedance transformer. The magnetostrictive transducer, acoustical impedance transformer, tool, tubular retainer and sealing ring comprise an insert detachable as a single unit by being withdrawn axially from the barrel.

16. The magnetostrictive transducer is of a length substantially corresponding to one-half wavelength of sound traveling longitudinally through the material of the transducer at the frequency of the alternating magnetic field applied through the energizing coil. The acoustical impedance transformer and work tool have a combined length substantially corresponding to one-half of the wavelength of sound traveling longitudinally through these elements at the frequency of vibration of the magnetostrictive transducer.

17. The acoustical impedance transformer is formed with a head section and a stem section joined by a tapered neck section, the head and stem sections each having substantially uniform cross-sectional areas throughout their lengths with the cross-sectional area of the head section being substantially greater than that of the stem section. The acoustical impedance transformer presents a solid,

uninterrupted metal path for the transmission of longitudinal vibrations from its juncture with the magnetostrictive transducer to the working tool, and the lengths and diameters of the head and stem sections are such as to provide a node of longitudinal vibrations at a point along the stem section of the transformer.

18. Claim 15 of patent '904 includes as elements in its combination a casing, means for generating a high frequency alternating magnetic field within said casing, a removable insert, including a transducer, an acoustical impedance transformer, a work tool, a tubular retainer having an axial bore and a neck section detachably connected to one end of the casing and a sealing ring engaging the transformer at approximately a node of longitudinal motion thereof.

19. The requirement in claim 15 that such resilient sealing ring shall be located at "approximately a node of longitudinal motion" means that it shall be located within about one-half inch of the actual node, assuming a vibratory system having an overall length of approximately eight inches. The removability and replaceability of the vibratory insert disclosed in the '904 patent is defined in claim 15 in the following language: "said insert being attachable and detachable as a unit from said casing by inserting and withdrawing the neck section of said retainer from the end of said tubular casing."

20. Claim 23 of the '904 patent defines the relative length of the magnetostrictive transducer, acoustical impedance transformer and work tool in terms of the wavelength of sound traveling through the material of these elements.

21. Claim 25 of the '904 patent defines the vibratory system in terms of the length of the magnetostrictive transducer, acoustical impedance transformer and work tool relative to the wavelength of sound traveling through the elements and specifically defines the acoustical impedance transformer as being dimensioned to provide a node of longitudinal vibration at a point along its stem section.

22. Claims 15, 23 and 25 of the '904 patent point with particularity to the structural arrangement and acoustical dimensions of the removable vibrator assembly described in the '904 patent.

*C. The '537 patent.*

23. Patent '537 is a divisional application of patent '288. It discloses an electrical power and water supply for an ultrasonic dental handpiece such as shown in the '288 or '904 patents. The '537 patent discloses a source of biased high frequency alternating current for energizing the coil in the handpiece and a solenoid valve for controlling the flow of fluid from a supply to the chamber in the handpiece casing.

24. The '537 patent further discloses a switch arrangement separate from the housing, for simultaneously controlling the application of high frequency alternating electrical power to the transducer and water to the handpiece casing so that the transducer is never energized without the concurrent flow of coolant into the handpiece chamber.

25. Claims 6 and 8 of the '537 patent point with particularity to the principal features of a power and water supply system for use with a handpiece as shown in the '288 or '904 patents.

III. VALIDITY

26. Devices constructed according to the claims in suit are new and useful under the patentability requirements of 35 U.S.C. § 101, being the first ultrasonic dental prophylaxis instrument commercially available to the dental profession and the first and only widely used for a number of years.

27. The Cavitron Model 210 Ultrasonic Dental Cutting Unit, first publicly sold in 1955, embodies the essential structure disclosed in the '288 and '537 patents, both of which were filed in 1954. Its use did not contravene the patentability requirements of 35 U.S.C. § 102 (b). The '904 patent, filed in 1958 was not barred by prior public use under that

statute. The 210 did not have a readily removable and replaceable vibratory insert composed of a magnetostrictive transducer and acoustical impedance transformer and a working tip rigidly connected in end-to-end relationship, in which changing of working tips was done by replacing the entire vibratory insert, as in the '904 patent. It did not have an acoustical impedance transformer with a head section and a stem section joined to the head section by a tapered neck section, the head and stem sections each having substantially uniform cross-sectional area throughout their lengths with the cross-sectional area of the head being substantially greater than that of the stem section, the vibratory insert being supported in the handpiece casing by a resilient member at the node, as in the '904 patent. Therefore, the use and sale of the Cavitron Model 210 from 1955 to 1957 did not anticipate or constitute a statutory bar applicable to the '904 patent.

28. The subject matter of claims 8 and 9 of the '288 patent, claims 15, 23 and 25 of the '904 patent and claims 6 and 8 of the '537 patent were all fully disclosed and claimed in the applications for the respective patents as originally filed in the Patent Office. Claims 6 and 8 of the '537 patent were amended to include the phrase "adapted to be" in several places at the suggestion of the Patent Examiner and were duly allowed as amended. The claims do not include new matter in contravention of the patentability requirements of 35 U.S.C. § 132.

29. The specification of the patents and claims in suit are in such full, clear, concise and exact terms as to enable persons skilled in the art of dental devices to make and use the alleged inventions and set forth the best mode contemplated by the inventor for carrying out his invention. It is not necessary that one attempting to follow the claims of the patent will have to experiment to obtain the claimed results. As will be later stated in greater detail, the Court finds that the defendant's device is a replica of the claims in suit and there has been no evidence introduced that the defendant was forced to experiment to produce the device.

The Court finds that the claims in suit do not fail to particularly point out and distinctly claim the devices of the inventions and that they are not vague, indefinite, ambiguous or uncertain. Among other items, the defendants have maintained that the claims of patent '537 specification as to the "solenoid 87c" are vague in that the solenoid was inoperative, but the testimony presented showed that in certain positions this was operative.

The claims in suit are not in contravention of the requirements for patent specification as set forth in 35 U.S.C. § 112.

30. In patent '537, the inclusion of the words "adapted to be" before the word "connected" in both claims, to comply with the ruling of the Patent Examiner, were additions made for the purpose of clarity and definiteness only, and do not create "file wrapper estoppel." The plaintiff's claim in regard to connection showed the power and water lines permanently attached to the source of supply. If the method of attachment had been by means of a plug and socket arrangement and the patent examiner had required the addition of the phrase "adapted to be" before the word "connected", then this might be a case of file wrapper estoppel. In such a case the inventor would be limited to the plug and socket arrangement and could not also claim the larger permanent connection if the claim had been issued under the limited language. However, here the "adapted to be" before "connected" cannot limit a permanent connection and therefore can only have been included for the purpose of clarity and not for limitation.

## IV. PRIOR ART—OBVIOUSNESS

### A. Generally.

31. The differences between the ultrasonic tools known in the prior art and

the ultrasonic dental instrument disclosed and claimed in the patents in suit are such as to confirm that it was not obvious to those engaged in the design of ultrasonic tools or to the dental profession that ultrasonic energy could be effectively employed in a small, hand-held instrument for safe and reliable dental therapy. Furthermore, the prior art introduced in evidence at the trial did not disclose any such useful dental instrument and confirms that it was not obvious to earlier workers in ultrasonics or to the dental profession how to construct such an instrument to meet the particular requirements of dental therapy and which would be safe, reliable and effective in operation. Therefore, the patents in suit are not invalid for obviousness of subject matter under 35 U.S.C. § 103.

32. The ultrasonic tools disclosed in the prior references were adapted for operation in drill presses or jigs to provide for precise vertical alignment of the vibratory assembly and for machine controlled movement of the vibrating tool to make and break contact with a rigidly fixed work piece. Such tools were not adapted for use in a hand-held instrument, and their structure and environment of use actually led away from the dental instruments of the patents in suit and suggested that working conditions such as would be encountered in dental therapy were unsuitable for the effective use of ultrasonic energy.

33. The Richards '470 patent is the only prior reference that purports to disclose an ultrasonic dental instrument. But the Richards instrument was inoperative for purposes of dental therapy, as reported by Richards and his co-investigators, and did not embody the essential structural features and arrangement disclosed and claimed in the patents in suit. The Richards patent was patterned after the teaching of the early Hayes patent No. 1,966,446 and confirms that the Hayes patent, which had set forth some of the elementary principles of mechanical vibratory assemblies, did not teach later workers in ultrasonics

how to construct a useful dental instrument.

B. Prior art cited by defendants in compliance with 35 U.S.C. § 282.

34. *Hayes Patent No. 1,966,446 Filed February 14, 1933—Issued July 17, 1934*

The Hayes patent discloses certain elementary principles and mathematical relationships relating to mechanically vibrating assemblies at sub-sonic and sonic frequencies and suggests that the vibratory energy from such assemblies might be usefully employed in various categories of impact tools such as pile drivers, rock drills and dental tools. But it does not show how any such tool is actually to be constructed except for a schematic layout for a rock drill that would produce vibrations at about 160 cycles per second.

The Hayes patent does not teach how to construct and mount a vibratory assembly that would operate effectively at ultrasonic frequencies, viz., above 16,000 cycles per second, and the schematic suggestions in the Hayes patent are not applicable to operation in the ultrasonic range. If practical at all, the Hayes layouts would work at frequencies of only a few hundred cycles.

The Hayes patent did not teach how to produce useful ultrasonic energy in a hand-held instrument and did not teach the resilient O-ring mounting of a vibrator in a hand-held instrument, as subsequently disclosed in the patents in suit, and thus did not anticipate the '904 patent. It did not disclose or suggest in any way a fluid supply or circulation system for any purpose in association with any of the impact tools described, and thus did not anticipate the '288 patent. It did not disclose a manually activated switch to simultaneously control both electrical and fluid supplies to the handpiece, and thus did not anticipate the '537 patent.

The references in the Hayes patent to teeth and dentistry constitute unsupported suggestions that mechanical vibratory energy at some unspecified fre-

quency, but apparently below the ultrasonic range, might turn out to be useful in a dental tool. Such references in the Hayes patent do not constitute evidence that it was subsequently known in the dental profession or that it was subsequently to be reasonably expected by workers in ultrasonics that ultrasonic energy could actually be applied in a practical manner in dental instrumentation or that a safe and reliable ultrasonic dental instrument was within the realm of practicality. On the contrary, the fact that the Hayes patent issued in 1934, about 21 years before plaintiff introduced the first ultrasonic dental instrument to the dental profession, is evidence that the Hayes Patent did not teach anything of significance in the development of ultrasonic dental instrumentation. Further, it was cited as a reference by the Patent Office during the prosecution of both the '288 and '537 patents and the claims of these patents were allowed by the Examiner with the Hayes patent before him.

35. *Balamuth Patent No. 2,580,716 Filed January 11, 1951—Issued January 1, 1952*

The Balamuth patent disclosed a machine tool and machining method for removing material from a solid body with ultrasonic energy. The device of the Balamuth patent included an ultrasonic transducer for driving a cutting tool which was brought into engagement with the part to be machined, all of the elements of the structure being mounted on a rigid frame and movable only along a fixed vertical path. It also disclosed a cooling water circulation system for the transducer of the apparatus and an independent abrasive slurry feed external of the vibratory system for supplying abrasive slurry to the working area. The coolant was not used as a warmed treating fluid as in the '288 patent.

It did not disclose a hand-held dental instrument in which a vibratory system was readily removable and replaceable as a unit from the enclosing casing and did not anticipate the '904 patent. It did not

disclose a manually activated switch to simultaneously control both electrical and fluid supplies to the handpiece, and did not anticipate the '537 patent.

36. *Calosi Patent No. 2,632,858 Filed November 16, 1950—Issued March 24, 1953*

The Calosi patent disclosed a vibratory tool consisting of a magnetostrictive transducer and a tapered vibratory element rigidly joined together and supported at the juncture within a tubular jacket which enclosed the transducer. A coolant circulation system was provided for the jacket and the entire structure was adapted for mounting in a drill press. The coolant was not used as a warmed treating fluid as in the '288 patent. The vibratory system was not readily removable and replaceable as in the '904 patent. There was no manually activated switch to simultaneously control both electrical and fluid supplied to the handpiece as in the '537 patent. The Calosi patent was cited as a reference by the Patent Office during the prosecution of the '904 patent and the claims of this patent were allowed by the Examiner with the Calosi patent before him.

37. *Carwile Patent No. 2,651,148 Filed November 23, 1949—Issued September 8, 1953*

The Carwile patent disclosed an ultrasonic vibratory device essentially the same as that disclosed by the Calosi patent and thus did not anticipate the '288, '904 or '537 patents. The Carwile patent was cited as a reference by the Patent Office during the prosecution of the '288 and '537 patents and the claims of those patents were allowed by the Examiner with the Carwile patent before him.

38. *Balamuth article "Mechanical Impedance Transformers in Relation to Ultrasonic Machining" Trans. IRE, Pgue—2 (November, 1954)*

This article discussed the mathematical design of different forms of mechanical impedance transformers for various applications in vibratory tools. The Bal-

amuth article did not disclose an ultrasonic dental instrument as in the '288, '904 and '537 patents and thus did not anticipate these patents.

39. *Nielsen, Richards and Wolcott Article "Ultrasonic Dental Cutting Instrument I and II", Journal of the American Dental Association, April, 1955*

The Nielsen, Richards and Wolcott article described an ultrasonic dental instrument having a vibratory system composed of a hollow magnetostrictive tube with the working tip formed at one end thereof. The vibratory tube was rigidly and not resiliently mounted within an outer housing at its nodal plane, approximately mid-point of the tube. The vibratory system was not readily removable and replaceable as a unit as in the '904 patent. A liquid circulation path was provided for cooling the transducer and an external slurry feed to the working tip was employed. The coolant was not used as a warmed treating fluid as in the '288 patent. The results obtained with the instrument were described by the authors as "inconclusive" and the performance of the instrument itself characterized as "erratic" and "unpredictable". It did not antedate the filing date of the '537 patent nor did it disclose a manually activated switch to simultaneously control both electrical and fluid supplied to the handpiece as in the '537 patent.

40. *Balamuth et al Patent No. Re: 25,033. Original filed March 19, 1954—Issued August 29, 1961*

The Balamuth et al patent disclosed a vibratory machine tool having a magnetostrictive transducer, an acoustical impedance transformer and a working tool, with the transducer enclosed within a water-tight cylindrical housing through which a coolant was circulated. The coolant was not used as a warmed treating fluid at the working tip as in the '288 patent. The vibratory system was rigidly and not resiliently mounted to the housing at a nodal point on the acoustical impedance transformer. A working tool, shaped so as to provide additional amplification at the tip, was threadedly coupled to the end of the acoustic impedance transformer and the vibratory system was not readily removable and replaceable as a unit, as in the '904 patent. There was no manually activated switch to simultaneously control both electrical and fluid supplies to the handpiece as in the '537 patent.

41. *Richards Patent No. 2,874,470 Filed May 28, 1954—Issued February 24, 1959*

The Richards patent disclosed the ultrasonic dental tool which was described in the Nielsen, Richards and Wolcott article and which was reported by them as being unpredictable and unreliable in operation. In the Richards instrument, the ultrasonic vibrations were to be produced by a hollow magnetostrictive tube, as earlier proposed by Hayes for a rock drill operating at a much lower frequency. The tube was rigidly supported at its nodal plane within an outer casing and a working tool was formed at one end of the tube. The Richards patent was cited by the Examiner during the prosecution of the '288 patent, the '904 patent and the '537 patent and the claims in suit were allowed by the Examiner with the Richards patent before him.

The Richards patent did not disclose an ultrasonic dental tool having a casing chamber formed between an end closure and a resilient sealing element which supports a vibratory system within the casing, or a fluid supply system in which coolant was used as a warmed treating fluid at the working tip as in the '288 patent. It did not disclose a readily removable and replaceable vibratory insert composed of a magnetostrictive transducer, an acoustical impedance transformer and a working tip rigidly connected in end-to-end relationship and supported within the casing at approximately a node of motion thereon, the transducer and the combined acoustical impedance transformer and working tip each having a length equal to one-half wavelength through the material of the respective elements at the energizing frequency, as in the '904 patent. The Rich-

ards patent did not disclose a manually activated switch to simultaneously control both electrical and fluid supplies to the handpiece, as in the '537 patent.

42. *Nilson et al Patent No. 1,244,070 Filed June 21, 1916—Issued October 23, 1917*

The Nilson et al patent disclosed a fountain pen construction with the various parts thereof secured together by screw threads. It did not disclose anything about ultrasonics.

43. *Lockwood Patent No. 2,499,659 Filed January 5, 1948—Issued March 7, 1950*

The Lockwood patent disclosed a coupling arrangement for a grease gun which allowed the grease nozzle to be oriented into proper alignment with the fittings to which the grease is to be applied. The coupling included a cap threaded to a retaining body housing a bias spring. A non-resilient sealing element was retained with the cap. It did not disclose anything about ultrasonics nor did it disclose anything that was relevant to the problem of how to mount a vibratory assembly in a hand-held instrument.

44. *Smith Patent No. 2,677,416 Filed September 25, 1948—Issued May 4, 1954*

The Smith Patent disclosed a welding torch with a nozzle and did not disclose anything that is relevant to ultrasonics or dental instruments.

45. *Instruction book for Sonar Set AN/UGC—1A, Bureau Ships Navy Department, Approved April 25, 1952, Declassified August, 1954*

The Instruction Book disclosed a detachable connector for coupling electrical wires between two pieces of electronic equipment. It did not disclose anything that is relevant to ultrasonic dental instruments.

46. Although certain of the elements of the claims in suit were disclosed in the prior art, nowhere was an entire claim anticipated such that the claim could be held invalid for failing to comply with the non-obvious provisions of 35 U.S.C. § 103.

## V. INFRINGEMENT

47. Defendant, Ultrasonic Research Corporation, began offering for sale to the dental profession an ultrasonic dental prophylaxis instrument known as the "Sonic Scaler" late in 1965, and continued the sale of such instruments at least until the fall of 1966. Late in 1966, defendant, Sonic, began to offer Sonic Scaler units for sale to the public. In the fall of 1967 Sonic began offering for sale to the dental profession an ultrasonic dental prophylaxis instrument known as the "Dynamic Scaler". At about the same time, Sonic began to manufacture an ultrasonic dental prophylaxis instrument known as the "Unisonic Scaler" for distribution and sale by Unitek Corporation and Precision Research Corporation. The main infringing device upon whch proof of infringement was offered at the trial was the "Unisonic Scaler".

### A. *The '288 Patent*

48. The Unisonic Scaler includes a handpiece having a casing and a vibratory system with a magnetostrictive transducer extending within the casing. The vibratory system is resiliently mounted by O-rings which seal off a casing chamber within the handpiece into which the magnetostrictive transducer of the vibratory system extends. A coolant supply line and an electrical supply line passes through the closure assembly at one end of the chamber. There is also a withdrawal line which taps the casing chamber for conducting the fluid used to cool the magnetostrictive transducer to a point adjacent the tip of the work tool so that the fluid warmed by the heat of the magnetostrictive transducer may also be employed as the fluid supplied to the work area. The Unisonic Scaler operates at a frequency of about 26,000 cycles per second.

49. All structural and functional elements recited in claims 8 and 9 of the '288 patent are found in the Unisonic Scaler. The Unisonic Scaler operates in the same way and produces the same re-

sults as the instrument of the '288 patent.

### B.  *The '904 Patent*

50.  The Unisonic Scaler includes a handpiece having a tubular casing within which is retained a magnetic coil for establishing a high frequency alternating magnetic field within the casing, and a rigid one-piece vibratory system composed of a magnetostrictive transducer, an acoustical impedance transformer and a work tool in end-to-end relationship. A tubular retainer fits loosely around the acoustical impedance transformer and has a neck section designed to be detachably connected to one end of the casing.  The vibratory system and tubular retainer, as a unit, may be inserted or withdrawn from the handpiece.

51.  In the Unisonic Scaler, there is also a sealing ring of compliant material which fits snugly between the inner surface of the tubular retainer and the outer surface of the acoustical impedance transformer and which contacts the stem section of the latter within approximately one-half inch of the node of longitudinal motion established therein when the insert is energized.  The magnetostrictive transducer of the Unisonic Scaler is formed of a number of thin laminates of magnetostrictive metal compactly stacked and maintained in stacked relation by means at one end of the stack.

52.  The magnetostrictive transducer of the Unisonic Scaler is of a length corresponding substantially to one-half wavelength of sound traveling longitudinally through the material of the transducer at the frequency of the energizing alternating magnetic field applied by the surrounding coil in the handpiece.  The combined length of the acoustical impedance transformer and work tool of the Unisonic Scaler is substantially one-half wavelength of sound traveling longitudinally through the transformer work tool at the frequency of vibration of the transducer.

53.  The acoustical impedance transformer of the Unisonic Scaler presents an uninterrupted path for the trans-

mission of ultrasonic vibrations and is formed of metal with a head section of a substantially uniform cross-sectional area and a stem section of a substantially uniform cross-sectional area smaller than the cross-sectional area of the head section, the two sections being joined by a tapered neck section, the relative dimensions of the head and stem sections being such that when excited at the frequency of vibration of the transducer, a node of longitudinal vibration of the overall vibratory system occurs at a point along the stem section of the acoustical impedance transformer.

54.  All of the structural and functional elements recited in claims 15, 23 and 25 of the '904 patent are found in the Unisonic Scaler.  The Unisonic Scaler functions in the same way and produces the same results as the instrument with its removable vibrator assembly that is described in the '904 patent.

### C.  *The '537 Patent*

55.  The power and water supply for the Unisonic Scaler includes an oscillation generator circuit for producing high frequency alternating current of about 26,000 cycles per second from normal line current, and an electrically operated valve for controlling the flow of fluid, both located in a housing and connected by a flexible conduit to the handpiece. The Unisonic Scaler includes a manually actuated switch connected with, but separate from, the housing for simultaneously controlling the flow of fluid through the valve to the handpiece and the flow of high frequency alternating current to the handpiece to energize the vibratory element.

56.  The only difference between the Unisonic Scaler and the claims of the '537 patent are that the claims under the language "adapted to be connected" show a permanent attachment of the power and water supply to the source and the Unisonic Scaler has the power and water supply connected with the source through a plug and socket arrangement.  This is not a substantial structural difference.

57. Each of the structural and functional elements recited in claims 6 and 8 of the '537 patent are found in the Unisonic Scaler. The power and water supply for the Unisonic Scaler functions in the same way and produces the same results as the system shown in the '537 patent.

## VI. FALSE MARKING

58. Defendant Sonic has charged plaintiff with false marking of its Cavitron "660" unit in an advertisement published at page 8 of the May, 1968 issue of the American Journal of Orthodontics. The advertisement designates as its author and source of information, The Dentist's Supply Company of New York, York, Pennsylvania. There is no evidence that plaintiff caused the publication of such advertisement or was responsible for its contents.

59. Plaintiff is also charged with false marking in its most recent catalog, Form No. 2197–C. The part of Form No. 2197–C bearing the patent notice indicates the author to be The Dentist's Supply Company of New York, York, Pennsylvania, and there is no evidence that plaintiff caused the publication of such form or was responsible for its contents.

60. There is no evidence that plaintiff has made any improper reference to any patent in any advertisement. There is no evidence that plaintiff has attempted to deceive the public by any patent marking. There is no evidence that in either of the two instances claimed by defendants to be "false marking", plaintiff had the "intent to deceive the public."

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter by virtue of 28 U.S.C. § 1338.

2. The patents in suit are valid in that they do not violate the requirements of utility; they are not barred by prior public use; they do not contain new matter in amendments; their specifications are in clear and concise terms and are not vague and ambiguous; and they are not subject to file wrapper estoppel.

3. The claims of the patents in suit are not anticipated by the prior art. Although each of the elements in the patent may have been well known in the prior art, the combination of those elements in the patents in suit produced a novel and useful result. This has been held to be the required test for patentability, both in the Supreme Court, United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) and Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) and in the Fifth Circuit. Bryan v. Sid W. Richardson, Inc., 5 Cir., 254 F.2d 191 (1958), Fairchild v. Poe, 259 F.2d 329 (1958), Samuelson v. Bethlehem Steel Co., 323 F.2d 944 (1963), Duo-Flex Corp. v. Building Service Co., 322 F.2d 94 (1963), and Zero Manufacturing Co. v. Mississippi Milk Pr. Ass'n, 358 F.2d 853 (1966).

4. The patents in suit are valid.

5. Although Defendant Sonic claims that there is no infringement because there are some minor changes in the Unisonic Scaler such as a smaller number of distinct parts, and the plug and socket connection, rather than the permanent connection to the power and water supply, it is well established that defendants may not avoid infringement by the introduction of insignificant structural details differing from the patent disclosure. An excellent discussion appears in Samuelson v. Bethlehem Steel Co., supra.

6. Sonic has infringed claims 8 and 9 of the '288 patent, claims 15, 23 and 25 of the '904 patent and claims 6 and 8 of the '537 patent by the manufacture and sale of ultrasonic dental prophylaxis units.

7. Plaintiff did not falsely mark advertising literature or its produce with patent numbers not applicable to the products, nor did plaintiff intend to deceive the public. Defendant Sonic has failed to establish its counterclaim under 35 U.S.C. § 292.

8. Plaintiff's right to the relief sought is not barred by the false mark-

**304**

ing alleged and the provisions of 35 U.S.C. § 292 are not applicable as a defense against the charge of infringement.

9. Plaintiff is entitled to the injunctive relief sought.

10. Plaintiff is entitled to an accounting of the actual damages sustained by the plaintiff as a result of the infringing manufacture and sale by defendants of ultrasonic prophylaxis units. All matters relating to notice of infringement, to the accountability for infringement of the individual defendants and of defendant Ultrasonic Research Corporation, and to the award of costs and attorneys' fees, are reserved for hearing at such accounting and for determination after such accounting shall be had.

11. The Court will, upon application, appoint a special master for the accounting.